IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,640

STATE OF KANSAS,
*Appellant*,

v.

LEE SAWZER SANDERS,
*Appellee*.

SYLLABUS BY THE COURT

1.

In reviewing the granting or denial of a motion to suppress evidence, appellate courts determine whether the factual findings underlying the district court's decision are supported by substantial competent evidence. Its ultimate legal conclusions are reviewed de novo. Appellate courts do not reweigh evidence or make credibility determinations.

2.

The State bears the burden of proving the lawfulness of its search and seizure.

3.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. The United States Supreme Court has interpreted this prohibition to require law enforcement officers who seize an individual or who conduct a search to have either a warrant or a basis for relying on one of the specific and well-recognized exceptions to the warrant requirement.

4.

One exception to the warrant requirement allows an officer to stop and briefly detain an individual without a warrant when the officer has an articulable and reasonable

1

suspicion, based in fact, that the detained person is committing, has committed, or is about to commit a crime.

5.

To have reasonable suspicion to detain an individual, a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. The suspicion must have a particularized and objective basis and be something more than a suspicion or hunch.

6.

A party must object to inadequate findings of fact or conclusions of law to preserve the issue for appeal. When a party fails to object, an appellate court can presume the district court found all facts necessary to support its judgment. Remand is necessary only where the record does not support such a presumption and the lack of findings precludes meaningful review.

7.

Under the exclusionary rule, if a criminal defendant challenges the State's use of evidence obtained in violation of the Fourth Amendment to the United States Constitution, a court may suppress the primary evidence obtained as a direct result of an illegal search or seizure and evidence later discovered and found to be derivative of an illegality. But the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons. Instead, to trigger the exclusionary rule, police conduct must be sufficiently deliberate, reckless, or grossly negligent, or, in some circumstances, recurring or systemic negligence, so that exclusion can meaningfully deter it.

8.

The attenuation doctrine is an exception to the exclusionary rule. It applies when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.

9.

No bright-line rule defines when the attenuation doctrine applies. Rather, courts must examine the particular facts of each case and determine whether those circumstances attenuate the taint of illegality.

10.

When a party appeals a ruling based on the attenuation doctrine, the appellate court considers a question of fact to determine whether it is supported by substantial competent evidence. Substantial competent evidence possesses both relevance and substance and furnishes a substantial basis in fact from which a court can reasonably resolve the issues. An appellate court does not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.

11.

The United States Supreme Court has identified three nonexclusive factors for determining whether the attenuation doctrine applies. First, courts look to the temporal proximity between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the unconstitutional seizure. Second, courts consider intervening circumstances. Third, and particularly significant, a court examines the purpose and flagrancy of the official misconduct. No one factor is controlling, and other factors also may be relevant to the attenuation analysis.

3

12.

Under the attenuation doctrine's temporal proximity factor, a finding of attenuation is not generally appropriate unless substantial time elapses between an unlawful act and the discovery of evidence.

13.

Under *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016), a valid, preexisting, and untainted arrest warrant is an intervening factor that strongly favors the State. This holding abrogates that portion of *State v. Moralez*, 297 Kan. 397, 415, 300 P.3d 1090 (2013), holding the discovery of a preexisting warrant carries little weight when applying the attenuation doctrine. It does not abrogate other portions of *Moralez*.

14.

An arrest warrant discovered after a search does not intervene in the causal chain between the constitutional violation and the discovery of evidence. It thus is not an intervening circumstance for purposes of the attenuation doctrine analysis.

15.

Whether the third attenuation factor of purposeful or flagrant misconduct weighs in favor of suppression turns on multiple factors, including whether the officer acted in good faith, committed multiple unconstitutional acts during the unconstitutional seizure, or acted as part of a systemic and recurrent pattern of police misconduct. As to the factor of good faith, the officer's subjective state of mind weighs heavily. Courts should generally find purposeful and flagrant misconduct if: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his or her conduct was likely unconstitutional but still engaged in it; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up.

4

16.

Generally, parties may not raise constitutional issues for the first time on appeal unless they successfully argue that one of three recognized exceptions applies. Based on this principle, Supreme Court Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 34) requires an appellant's brief to include a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court. Litigants who ignore this rule risk a ruling that the issue has been waived or abandoned.

Review of the judgment of the Court of Appeals in an unpublished opinion filed May 25, 2018. Appeal from Shawnee District Court, MARK S. BRAUN, judge. Opinion filed July 26, 2019. Judgment of the Court of Appeals reversing the district court is reversed. Judgment of the district court is affirmed.

*Rachel L. Pickering*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with her on the briefs for appellant.

*Reid T. Nelson*, of Capital and Conflicts Appeals Office, argued the cause, and was on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: In this interlocutory appeal of a district court order suppressing evidence, the State argues the district court committed two errors. A Court of Appeals panel rejected the State's argument about one error but agreed with the State on another. Specifically, it rejected the argument that the district court erred by concluding police officers lacked reasonable suspicion to detain Lee Sawzer Sanders. But it agreed with the State that the attenuation doctrine applied and the district court should not have suppressed the evidence obtained in a search of Sanders. In invoking the attenuation doctrine, the panel noted that, after the officers seized and searched Sanders, they discovered a preexisting arrest warrant. This discovery attenuated the taint of the

unconstitutional seizure, according to the panel. See *State v. Sanders*, No. 118,640, 2018 WL 2375258, at *1, 5-7 (Kan. App. 2018) (unpublished opinion).

Sanders petitioned for review arguing the panel erred in applying the attenuation doctrine under these facts. And the State cross-petitioned arguing the panel erred in holding the officers lacked reasonable suspicion to detain Sanders and in failing to consider its alternative argument that the inevitable discovery doctrine also provides a basis for concluding the district court should not have suppressed the evidence.

We granted review and now reverse the Court of Appeals panel and affirm the district court. We agree with the district court's and the panel's determinations that the officers lacked reasonable suspicion to detain Sanders. We disagree, however, with the panel's application of the attenuation doctrine. The panel held the officers' discovery of a search warrant interrupted the causal chain between the detention and the search. But the search of Sanders occurred before the officers discovered the arrest warrant. While the officers searched some possessions they had seized after they discovered the warrant, the search incident to arrest exception to the warrant requirement—the exception discussed by the Court of Appeals—did not apply because the items were no longer in Sanders' reach or control. And while, for the first time on appeal, the State offers the inevitable discovery doctrine as an exception to the exclusionary rule and the inventory search exception as an alternative basis to justify the search, it failed to preserve these arguments and we decline to address them. We thus conclude the district court did not err in suppressing the evidence obtained when the officers searched Sanders.

FACTUAL AND PROCEDURAL BACKGROUND

Sanders was stopped by two Topeka Police Officers, Raph Belt and Cody Purney, in a restaurant's parking lot. The officers provided differing accounts of the event. Officer Belt testified he and Officer Purney had just finished investigating an unrelated incident

6

and were seated in their parked patrol car when they noticed Sanders trying to open the door of a nearby car. Officer Belt testified that Sanders saw the officers, walked away from the car, and went into a nearby alleyway. In contrast, Officer Purney testified they had not been responding to a call but were driving down the road in what he described as "self-initiated activity" or "free mode." Officer Purney stated he had not seen Sanders trying to get into the car. Instead, Officer Belt told him he saw Sanders close the car door and go down the alleyway. Officer Belt alleged Sanders tried to conceal himself in the alleyway. He testified he "[k]ind of hollered at [Sanders], 'hey, I would like to speak with you.'" Officer Belt claimed Sanders ran from him, although Sanders ultimately stayed in the vicinity of the restaurant and returned to the car, which officers later learned belonged to Sanders. At that point, Officer Belt physically contacted Sanders and placed him in handcuffs.

Officer Belt then asked Sanders if he had any weapons on his person, and Sanders said he had a knife in his pocket. Officer Belt conducted a pat-down of Sanders' person and felt an item he thought was a pocket knife that turned out to be a key. Officer Belt asked Sanders where the knife might be. Sanders told him it might be in his vehicle but he was not sure. Officer Belt asked to search Sanders for the knife and Sanders agreed. Officer Belt found a methamphetamine pipe, deck of cards, and "a prison or a jail I.D." Officer Purney then ran a warrant check and discovered an outstanding arrest warrant. Sanders was arrested and Officer Belt went through the items taken from Sanders' person, finding a small bag containing methamphetamine inside the card deck.

The State charged Sanders with possession of methamphetamine and possession of drug paraphernalia. Sanders filed a motion to suppress evidence, arguing he had been unlawfully seized and searched. The district court granted Sanders' motion, finding the officers' testimony conflicting and "too much of the answers to the questions or the scenario posed by the officers appears to be that of filling in the blanks after the fact as opposed to what they did, why they did it at the time." The district court found it was "not

7

clear that the officer was truly investigating or making contact with somebody who was committing or had committed or was about to commit a crime." The court also said it

"watched the officers and their facial expressions as they testified separately and watched and listened to what their conduct was, the things that might have been questionable, they could not recall, were not aware of, and it was things that they seemed—the impression I get from listening to their testimony is that they pieced things together after the fact."

Additionally, the district court found "contradictions and inconsistency in the testimony between the officers that doesn't really balance or fit the two with each other," and stated:

"The other part—well, my initial issue is the contact that the officer had in taking the defendant into custody, I have great difficulty with and I've tried to look at the fact of balancing whether the—I don't remember if it's the Attenuation Doctrine. You know, at some point, they find out there's a warrant but my belief, counsel, is that the activity or that the whole issue of seizing the defendant, I have great difficulty with based on the testimony that I've heard."

The district court held: "I still think the whole thing had been set up to be able to make contact and do those things with the defendant. Then they find out about the warrant."

The State filed an interlocutory appeal. The Court of Appeals upheld the district court's finding that the officers lacked reasonable suspicion to detain Sanders. But the panel reversed the district court's decision to suppress the evidence based on the United States Supreme Court's attenuation doctrine analysis in *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2060-62, 195 L. Ed. 2d 400 (2016), because of the discovery of the arrest warrant. See *Sanders*, 2018 WL 2375258, at *1, 5-7.

8

Sanders timely petitioned for review and the State filed a timely cross-petition. We granted review of Sanders' petition and the State's cross-petition. Our jurisdiction is proper under K.S.A. 20-3018(b) (petition for review of Court of Appeals decision).

ANALYSIS

All issues before us relate to a warrantless seizure and search and the district court's decision to suppress the evidence obtained as a result. In reviewing the granting or denial of a motion to suppress evidence, we determine whether the factual findings underlying the district court's decision are supported by substantial competent evidence. Its ultimate legal conclusions are reviewed de novo. In doing so, we do not reweigh evidence or make credibility determinations. See *State v. Patterson*, 304 Kan. 272, 274, 371 P.3d 893 (2016). The State bears the burden of proving the lawfulness of its search and seizure. *State v. Reiss*, 299 Kan. 291, 296, 326 P.3d 367 (2014).

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. *State v. Ramirez*, 278 Kan. 402, 404, 100 P.3d 94 (2004). The United States Supreme Court has interpreted this prohibition to require law enforcement officers who seize an individual or who conduct a search to have either a warrant or a basis for relying on one of the specific and well-recognized exceptions to the warrant requirement. See *Riley v. California*, 573 U.S. 373, 382, 134 S. Ct. 2473, 2482, 189 L. Ed. 2d 430 (2014); *State v. Neighbors*, 299 Kan. 234, 239, 328 P.3d 1081 (2014).

Before considering whether a search was lawful, a court should consider the legality of the initial seizure, as an unlawful seizure may taint the fruits of the later search. See *State v. Thompson*, 284 Kan. 763, 777, 166 P.3d 1015 (2007). One exception to the warrant requirement allows an officer to stop and briefly detain an individual without a warrant when the officer has an articulable and reasonable suspicion, based in fact, that the detained person is committing, has committed, or is about to commit a

crime. See *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Epperson*, 237 Kan. 707, 711-12, 703 P.2d 761 (1985).

To have reasonable suspicion to detain an individual, "[a] police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. The suspicion must have "'a particularized and objective basis'" and be something more than "an unparticularized suspicion or hunch." *State v. DeMarco*, 263 Kan. 727, 735, 952 P.2d 1276 (1998) (quoting *Ornelas v. United States*, 517 U.S. 690, 696, 116 S. Ct. 1657, 134 L. Ed. 2d 911 [1996], and citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 [1989]). Although the United States Supreme Court has recognized that "the concept of reasonable suspicion is somewhat abstract," it has "deliberately avoided reducing it to '"a neat set of legal rules."'" *United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002).

With that background in mind, we turn to the parties' three arguments that (1) the district court erred by ruling the officers did not have reasonable suspicion to detain Sanders, (2) the district court erred by failing to apply the attenuation doctrine exception to the exclusionary rule, and (3) the Court of Appeals erred by not applying the inevitable discovery doctrine.

1. *The officers lacked reasonable suspicion to detain Sanders.*

The first argument we consider is one presented by the State. It argues the Court of Appeals panel erred by upholding the district court's finding that the officers lacked reasonable suspicion. See *Sanders*, 2018 WL 2375258, at *5-6.

First, the State asserts the panel erred in concluding the officers lacked reasonable suspicion to *pursue* Sanders rather than focusing on whether the officers had reasonable

suspicion when they seized Sanders. The State is correct to the extent that the Constitution prohibits an unreasonable seizure, and Sanders was not seized until he stopped or yielded to a show of authority. Thus, as the State argues, we do not look only at what the officers observed before they began to pursue Sanders. We must also examine the officers' observations between the time they began pursuing him and when he finally stopped. See *California v. Hodari D.*, 499 U.S. 621, 628-29, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (foot chase did not become a seizure until defendant stopped); *State v. Sharp*, 305 Kan. 1076, 1084-85, 390 P.3d 542 (2017) (reasonable suspicion is a fluid concept and the existence of reasonable suspicion may change once new facts are observed by officers).

Establishing these points of law does not translate to an error by the district court or the Court of Appeals, however. The district court correctly applied the law by considering all the circumstances up until the officers took custody of Sanders. It stated: "[M]y initial issue is the contact that the officer had in taking the defendant into custody, I have great difficulty . . . ." And the Court of Appeals considered events from the time the officers saw Sanders until they physically detained him. So we begin our analysis with the understanding the district court and Court of Appeals considered all the evidence weighing on reasonable suspicion, including Sanders' alleged unprovoked flight and attempt to secrete himself.

Second, in arguing the district court erred, the State focuses on evidence that it characterizes as Sanders' attempt to conceal himself and to flee from police. The State argues these circumstances support reasonable suspicion. And these points are critical to the State's argument. In its cross-petition, the State does not argue there was reasonable suspicion absent these two factors. And the State essentially conceded as much at the suppression hearing, stating: "Your Honor, defense would be correct if this individual hadn't run and tried to conceal himself by the building." The State has thus abandoned the point that the officers lacked reasonable suspicion before they began pursuing Sanders.

11

See Supreme Court Rule 8.03(c)(3) (2019 Kan. S. Ct. R. 53) (cross-petitioner must raise issues adversely decided by the Court of Appeals to preserve them for review).

But the officers' observations before that point are relevant to our consideration because *Illinois v. Wardlow*, 528 U.S. 119, 124-25, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), instructs us to consider the totality of the circumstances when unprovoked flight is a major component of the argument that reasonable suspicion exists. See 528 U.S. at 124. So we begin our discussion at the initial sighting of Sanders by the officers.

Officer Belt testified he saw Sanders "messing with the [door] handle" and may have had a key or something else in his hand. In contrast, Officer Purney did not see what happened but testified that Officer Belt told him he saw Sanders *close* the door. Neither officer testified they saw Sanders approach the vehicle, and Officer Belt did not testify whether he observed anyone inside the vehicle before he saw Sanders. Based on these observations, there was no basis to infer Sanders was attempting to enter or break into the vehicle as opposed to having exited the vehicle, locked the door with a key, and pulled the handle to ensure the door was locked before walking away.

Even if Sanders was approaching the vehicle, the officers' observations did not support a reasonable inference of criminal activity. Officer Belt testified he did not see any apparent burglary tools in Sanders' possession. And Sanders' actions were visible, not only to the police but to others. The officers' encounter with Sanders occurred in the early evening hours in a lit parking lot next to a well-travelled city street. The restaurant was open for business and was next to an apartment building. The officers did not testify to any reason to suspect Sanders was not a customer or employee of the restaurant or a resident or guest at the apartments. In other words, nothing about Sanders' behavior when the officers first spotted him creates a reasonable suspicion he had committed, was committing, or was about to commit a crime.

12

Next, Sanders walked away from the car. Even assuming he saw the officers, his walking away, standing alone, does not provide reasonable suspicion to detain. See *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983) (law enforcement officers may approach and seek to speak with an individual; yet, without reasonable suspicion to detain the individual, the person is free to refuse to answer the officer's questions and simply walk away, and doing so does not furnish reasonable suspicion); *Epperson*, 237 Kan. at 713 ("That the men appeared startled when the patrol car emerged from the alley, that the passenger appeared to reach down to the floorboard area, and that the men got out of the car and started to walk away, is not indicative of criminal activity.").

Sanders then walked into the alleyway and, according to Officer Belt, attempted to conceal himself behind a drainpipe. The State argues that an attempt at concealment supports reasonable suspicion and cites *United States v. Smith*, 396 F.3d 579, 585 (4th Cir. 2005). There, a driver, after seeing a police roadblock, turned off a highway to avoid the officers. Quoting *Wardlow*, 528 U.S. at 124-25, the Fourth Circuit Court of Appeals stated that "'[h]eadlong flight' or other 'nervous, evasive behavior' in response to a roadblock may contribute to reasonable suspicion that the driver is engaged in criminal activity. . . . Such evasive behavior is 'not going about one's business.'" *Smith*, 396 F.3d at 584. *Smith* is distinguishable for two reasons.

First, as we have discussed, it is not clear that Sanders had spotted the police. In contrast, the driver in *Smith* admitted that he had. 396 F.3d at 582. Second, nothing in this record establishes that Sanders was not going about his business at that point. All the record contains about a possible attempt at concealment is Officer Belt's claim that Sanders attempted to hide behind a drainpipe in the alleyway. Often an officer's impression of an individual's actions would be enough to support a reasonable suspicion. Here, however, the district court discounted Officer Belt's testimony finding "too much of the answers to the questions or the scenario posed by the officers appears to be that of

13

filling in the blanks after the fact as opposed to what they did, why they did it at the time."

In addition, the officer's belief, assertion, or hunch is not the critical consideration. Rather, a question of fact arises about whether Sanders intended to conceal himself or was merely standing by the drainpipe for some innocent purpose. See *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 (2014) (intent is a question of fact that "may be inferred from the established circumstances of a case, provided the inferences are reasonable"). But the district court did not specifically address the possibility of concealment and made no factual findings on this point.

Despite the lack of an explicit ruling, the State failed to object or request a clarification. A party must object to inadequate findings of fact or conclusions of law to preserve the issue for appeal. See *State v. Herbel*, 296 Kan. 1101, 1119, 299 P.3d 292 (2013). When a party fails to object, an appellate court can presume the district court found all facts necessary to support its judgment. See *State v. Dern*, 303 Kan. 384, 394, 362 P.3d 566 (2015). Remand is necessary only where the record does not support such a presumption and the lack of findings precludes meaningful review. See *State v. Neighbors*, 299 Kan. 234, 240, 328 P.3d 1081 (2014).

Neither circumstance exists here. The district court concluded the officers lacked reasonable suspicion. And nothing in the record other than Officer Belt's supposition, which the district court appeared to find incredible, suggests that Sanders used the drainpipe as cover for concealing himself. The record reveals no details about the size and appearance of the drainpipe. Nor does the evidence otherwise explain why it was reasonable to believe a drainpipe would conceal someone. And a plethora of innocent explanations—smoking or making a call, for example—could explain why Sanders stood there.

14

Sanders apparently spotted the police at that time, if not before. And he then allegedly ran from the officers. But it is not clear that the district court believed Sanders ran. The court's findings about Sanders' running are mixed with its concerns about the inconsistencies in the officers' testimony.

In general, the district court was troubled by the officers' actions and conduct and began its ruling on the motion with: "All right. Counsel, this hearing is troublesome to the Court." To reiterate some of the other comments, because they frame our analysis, the district court found it was "not clear that the officer was truly investigating or was making contact with somebody who was committing or had committed or was about to commit a crime," and stated "the whole issue of seizing the defendant, I have great difficulty with based on the testimony that I've heard." The district court also stated the officers' testimony was inconsistent and they appeared to be "filling in the blanks after the fact," and "pieced things together after the fact." The record shows inconsistencies in the officers' testimony at the suppression hearing as well as discrepancies in what Officer Belt said at the suppression hearing and what he told Officer Purney at the time of the incident. The district court also found "[t]here were so many things that Officer Belt did not know," and stated it "watched the officers and their facial expressions as they testified . . . and watched and listened to what their conduct was, the things that might have been questionable, they could not recall, were not aware of." And the record shows Officer Belt did not know or could not recall several details of the surrounding events.

As to the specifics of Sanders running, the duration and nature of the pursuit, and whether Sanders was walking or running are points of conflict or inconsistency in the officers' testimony. The district court mentioned the differing accounts before stating "[t]he defendant apparently walked away initially and then at some point, *may* have run from the officer." (Emphasis added.) At another point, the district court stated some evidence established "there was some running." But the court followed this statement by restating its concerns about the conflicting testimony and its observations of the officers'

15

demeanor during that portion of their testimony. The district court's statements can be read as a finding that the officers *alleged* Sanders ran from them, not that the district court found that he did. And the district court's statement that Sanders "*may* have run from the officer" suggests it did not make a finding that Sanders ran. (Emphasis added.)

Again, the State failed to object to the district court's findings or lack of findings, or otherwise request a clarification. It thus did not preserve the issue for appeal. See *Herbel*, 296 Kan. at 1119. And given the district court's credibility concerns and the reasons given for its decision, we presume the district court properly considered the question of flight in reaching its ultimate conclusion. As a result, we need not remand for further findings. See *Dern*, 303 Kan. at 394; *Neighbors*, 299 Kan. at 240.

Turning from the district court's analysis to that of the Court of Appeals panel, the State contends the panel did not properly consider *Wardlow*'s holding in its analysis. But the panel explicitly mentioned *Wardlow* and distinguished it for three reasons:

> "First, there is no evidence in the record to establish that the [resturant's] parking lot was 'an area of expected criminal activity' nor did the State attempt to prove that it is in a high crime area. Second, there is no evidence in the record to suggest that the officers expected to encounter criminal activity in the [restaurant's] parking lot during business hours. Third, even if we assume that Sanders saw the patrol vehicle before he walked away from his car, walking away from one's car is not the type of 'headlong flight' referred to in *Wardlow*." *Sanders*, 2018 WL 2375258, at *6.

These distinctions are valid.

In summary, the district court's assessment that the State failed to carry its burden of proving the lawfulness of the seizure largely rested on the district court's concerns about the credibility of the officers' accounts. We cannot reweigh evidence, determine credibility, or make independent factual findings. See *Patterson*, 304 Kan. at 274. The

16

State has thus failed to show error in the conclusion of the district court that it was "not clear that the officer was truly investigating or making contact with somebody who was committing or had committed or was about to commit a crime." We, therefore, accept the lower courts' conclusions that the officers' initial seizure of Sanders was unsupported by reasonable suspicion.

2. *The attenuation doctrine does not save the fruits of the unlawful seizure.*

Sanders raises the next argument. He asserts the panel erred in considering the State's attenuation doctrine argument on appeal because the State did not raise the issue before the district court. We agree with Sanders that the State did not raise this issue to the district court. If it did, the point was incidentally raised by the prosecutor arguing that "it wasn't until after the warrant, after he was for sure going to jail that the methamphetamine was found inside the deck of cards." The State failed to cite caselaw about the attenuation doctrine. Specifically, it did not cite the case it now relies on, *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016). It even failed to use the words "attenuation doctrine" in its argument to the district court. But, as the Court of Appeals noted, the district court referenced the attenuation doctrine in its ruling:

> "The other part . . . I have great difficulty with and I've tried to look at the fact of balancing whether the—I don't remember if it's the Attenuation Doctrine. You know, at some point, they find out there's a warrant but my belief, counsel, is that the activity or that the whole issue of seizing the defendant, I have great difficulty with based on the testimony that I've heard."

Based on this brief reference, the Court of Appeals panel determined it could review the issue because the district court raised it sua sponte. See *Sanders*, 2018 WL 2375258, at *6. We agree that while brief, the district court did consider the doctrine and it made findings on the most critical of the attenuation doctrine factors—the flagrancy of

17

the police conduct. To put those findings in perspective, some background of the doctrine is helpful.

The attenuation doctrine is an exception to the exclusionary rule. *Strieff*, 136 S. Ct. at 2061. Under the exclusionary rule, if a criminal defendant challenges the State's use of evidence obtained in violation of the Fourth Amendment, a court may suppress the "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality," the so-called "'fruit of the poisonous tree.'" *Segura v. United States*, 468 U.S. 796, 804, 104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984); see *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963) (explaining fruit of poisonous tree doctrine); *State v. Deffenbaugh*, 216 Kan. 593, 598, 533 P.2d 1328 (1975) (same). But "'the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons.'" *Brown v. Illinois*, 422 U.S. 590, 599-600, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (quoting *United States v. Calandra*, 414 U.S. 338, 348, 94 S. Ct. 613, 38 L. Ed. 2d 561 [1974]). Instead, "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it . . . . [T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

The United States Supreme Court has recognized several exceptions to the exclusionary rule. Some of these "exceptions involve the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2061. Here, the State has placed one of those exceptions—the attenuation doctrine—in issue. The attenuation doctrine applies "when the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance, so that 'the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained.'" *Strieff*, 136 S. Ct.

at 2061 (quoting *Hudson v. Michigan*, 547 U.S. 586, 593, 126 S. Ct. 2159, 165 L. Ed. 2d 56 [2006]); see *Brown*, 422 U.S. at 603. No bright-line rule defines when the attenuation doctrine applies. Rather, courts must examine the particular facts of each case and determine whether those circumstances attenuate the taint of illegality. *Brown*, 422 U.S. at 603.

Given that requirement, when a party appeals a ruling based on the attenuation doctrine, the appellate court considers a question of fact that must be reviewed to determine whether it is supported by substantial competent evidence. See *State v. Smith*, 286 Kan. 402, 420, 184 P.3d 890, *cert. denied* 555 U.S. 1062 (2008). "Substantial competent evidence is that which possesses both relevance and substance and which furnishes a substantial basis in fact from which the issues can reasonably be resolved." *State v. Sharp*, 289 Kan. 72, 88, 210 P.3d 590 (2009). In reviewing a district court's factual findings for substantial competent evidence, "[a]n appellate court does not 'reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.'" 289 Kan. at 80 (quoting *State v. Harris*, 284 Kan. 560, Syl. ¶ 9, 162 P.3d 28 [2007]); see *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018) (appellate review of ruling on motion to suppress raises questions of fact to be reviewed for substantial competent evidence and an ultimate legal conclusion reviewed de novo).

To aid a district court's weighing of the facts, the United States Supreme Court in *Brown*, 422 U.S. at 603-04, identified three factors to be considered in determining whether the attenuation doctrine applies. This court later applied those factors. See *State v. Moralez*, 297 Kan. 397, 415, 300 P.3d 1090 (2013); *State v. Williams*, 297 Kan. 370, Syl. ¶ 9, 300 P.3d 1072 (2013). More recently in *Strieff*, the United States Supreme Court reiterated the *Brown* factors:

"First, we look to the 'temporal proximity' between the unconstitutional conduct and the discovery of evidence to determine how closely the discovery of evidence followed the

19

unconstitutional search. Second, we consider 'the presence of intervening circumstances.' Third, and 'particularly' significant, we examine 'the purpose and flagrancy of the official misconduct.'" 136 S. Ct. at 2062.

No one factor is controlling, and other factors also may be relevant to the attenuation analysis. See, e.g., *Brown*, 422 U.S. at 600-04 (concluding that giving of *Miranda* warnings, standing alone, cannot support attenuation where confession follows unlawful arrest; but noting that giving *Miranda* warnings is relevant factor to consider in determining whether confession was sufficiently attenuated from unlawful arrest); *State v. Martin*, 285 Kan. 994, 1003, 179 P.3d 457, *cert. denied* 555 U.S. 880 (2008) (noting that no single factor is dispositive).

We now turn to the Court of Appeals' application of these factors.

### 2.1 *Temporal proximity*

As to the first *Brown* factor of temporal proximity, the *Strieff* Court "declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." *Strieff*, 136 S. Ct. at 2062. Here, the district court did not make any explicit findings on the first factor. But the Court of Appeals panel determined "the first factor weighs in Sanders' favor due to the close proximity in the timing between the investigatory detention without reasonable suspicion and the discovery of the outstanding warrant." *Sanders*, 2018 WL 2375258, at *7.

We agree. The record does not show a substantial lapse in time between the initial detention and the discovery of evidence, and the State did not contest the panel's finding on this point. See *Strieff*, 136 S. Ct. at 2062 (because just minutes had passed between an illegal detention of Strieff and the discovery of drug contraband on him, the short time interval weighed in favor of suppression); Rule 8.03(c)(3) (cross-petitioner must raise

20

issues adversely decided by the Court of Appeals to preserve the point for review). The first factor thus weighs in favor of suppression.

## 2.2  *Intervening circumstances*

As to the second factor, the panel held "we find that the second factor weighs in favor of the State in light of the preexisting arrest warrant, which provides an intervening circumstance that dissipates the taint of the initial unlawful seizure." *Sanders*, 2018 WL 2375258, at *7. The district court did not make explicit findings on this point, but in discussing the attenuation doctrine it stated that "at some point, they find out that there's a warrant." Although, the district court considered the discovery of the arrest warrant, it is not clear how it weighed that circumstance in its decision to not apply the attenuation doctrine. But the relevant facts are not in issue, and the weighing of this factor comes down to applying relevant precedent.

*Strieff* clarified the importance of an arrest warrant as an intervening factor. After *Brown*, a split of authority had developed about the importance of an arrest warrant as an intervening circumstance. See *Strieff*, 136 S. Ct. at 2060; *Moralez*, 297 Kan. at 413 (collecting and discussing decisions). The United States Supreme Court granted certiorari in *Strieff* to resolve that split and, in doing so, specifically mentioned this court's *Moralez* decision in which we joined other states assigning "little significance" to the discovery of a warrant. *Strieff*, 136 S. Ct. at 2060.

The *Strieff* Court first addressed a threshold question of whether the attenuation doctrine even applies when the State relies on the discovery of a warrant as an intervening factor. The Court held that trial courts should apply the doctrine and the three-factor test set out in *Brown* if a preexisting warrant was discovered. 136 S. Ct. at 2061. To this extent, the *Strieff* Court upheld the *Moralez* court's use the attenuation doctrine and *Brown*'s three factors. And the *Strieff* Court did not disturb the *Moralez*

court's reasoning on any point other than the weight to be given to the discovery of a "valid, pre-existing, and untainted arrest warrant." 136 S. Ct. at 2061. On that point, the *Strieff* Court held an officer's discovery of an arrest warrant is an intervening factor that "strongly favors the State." 136 S. Ct. at 2062. Because we are bound to follow the United States Supreme Court's interpretation of the United States Constitution, this holding abrogates that portion of our decision in *Moralez* that joined other courts in giving little weight to the warrant as an intervening circumstance. But it abrogated only that portion of *Moralez.* See *State v. Lawson*, 296 Kan. 1084, Syl. ¶ 1, 297 P.3d 1164 (2013) ("The United States Supreme Court's interpretation of the United States Constitution is controlling upon and must be followed by state courts."). This means we must follow *Strieff* and give significant weight to the discovery of a valid, preexisting arrest warrant as an *intervening* factor. See 136 S. Ct. at 2062.

Here, however, Sanders was searched and the evidence was seized from his person *before* the warrant was discovered. *Strieff* found the discovery of a warrant strongly favors the State because a warrant is a judicial mandate to make an arrest and once the arrest is made, the officer can search the arrestee's person within the permissible scope of the search incident to lawful arrest exception. See 136 S. Ct. at 2063. In other words, *Strieff*'s reasoning was specific to a search incident to arrest *after* the warrant is discovered. See 136 S. Ct. at 2059, 2061, 2063. And we have held "the search incident to arrest exception to the warrant requirement applies *after* an arrest has been made; it does not apply where there is a possibility that an arrest might occur." *State v. Cleverly*, 305 Kan. 598, 614, 385 P.3d 512 (2016).

Under similar facts, the Tenth Circuit Court of Appeals recently emphasized that the circumstance must intervene—that is, it must fall between the constitutional violation and the discovery of evidence. It thus held the second *Brown* factor favored the defendant seeking to suppress evidence "because the arrest warrant wasn't discovered until after the search." *United States v. Gaines*, 918 F.3d 793, 801 (10th Cir. 2019); see *United States v.*

22

*Gaines*, 668 F.3d 170, 175 (4th Cir. 2012) (concluding evidence discovered before the defendant's independent criminal act cannot serve as "an intervening event" to purge the taint of an unlawful police action); *United States v. Camacho*, 661 F.3d 718, 730-31 (1st Cir. 2011) (concluding no intervening circumstances existed because the new ground for the search had arisen after discovery of the evidence); *United States v. Beauchamp*, 659 F.3d 560, 574 (6th Cir. 2011) (same).

Sanders was subject to an unlawful detention at the time of the search of his person. The warrant was not discovered until *after* Sanders had been searched, and it thus could not have provided lawful grounds to detain Sanders at the time of the search. The discovery of the warrant is thus not an intervening factor in the same sense as *Strieff*. See 136 S. Ct. at 2062-63.

We next must also consider what happened after the discovery of the arrest warrant because at that point Officer Belt rummaged through Sanders' property—namely, the deck of cards. To justify that search the State has mainly relied on *Strieff*. There, the United State Supreme Court upheld the search because the defendant had been lawfully arrested on the warrant and then the search had been lawfully conducted under the search incident to arrest exception to the warrant requirement. *Strieff*, 136 S. Ct. at 2063. Here, however, that exception does not apply. A search incident to arrest "may only include 'the arrestee's person and the area "within his immediate control"—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.'" *Arizona v. Gant*, 556 U.S. 332, 339, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009) (quoting *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 [1969]).

> "That limitation, which continues to define the boundaries of the exception, ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee

23

might conceal or destroy. . . . If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the rule does not apply." *Gant*, 556 U.S. at 339.

Officer Belt had seized the deck of cards before Sanders' arrest. So when Officer Belt examined the cards and discovered the baggie of methamphetamine, the deck of cards was not on Sanders, not in his custody, and not under his control. And no evidence suggests Sanders, who the officers had handcuffed, could have reached into the cards at the time of the search. While Sanders' arrest based on the warrant was undisputedly lawful, the search incident to lawful arrest exception did not justify the search of the deck of cards. See *Gant*, 556 U.S. at 339.

As we will discuss more fully, the State also argues the evidence should not have been suppressed because of the inevitable discovery doctrine. It contends that the discovery was inevitable because Sanders' personal possessions were inventoried by both Officer Belt and at book in at the Department of Corrections. We do not read the State's argument to be that an inventory search constituted an intervening circumstance. But, if we are wrong in our reading and that was its intended argument, we will more fully explain below various reasons the State failed to preserve the inventory search exception or the inevitable discovery doctrine for consideration on appeal. We thus hold neither justifies concluding an intervening circumstance attenuated the taint of the officers' unconstitutional seizure of Sanders.

In summary, the initial search of Sanders occurred before the discovery of the arrest warrant, and the warrant was not a circumstance that broke the causal chain between the unconstitutional seizure and the search. As to the search of the card deck after discovery of the arrest warrant, the State has failed to establish the applicability of an exception to the warrant requirement. Both before and after the discovery of the

warrant, the officers conducted warrantless searches. And both were per se unreasonable because the State has failed to establish a valid exception to the warrant requirement. See *Neighbors*, 299 Kan. at 239.

The second *Brown* factor favors suppression.

2.3 *Flagrancy*

The third attenuation doctrine factor—the purpose and flagrancy of the official misconduct—is perhaps the most critical to the analysis. See *Strieff*, 136 S. Ct. at 2062 (identifying this factor as "'particularly' significant"). Its significance arises because it focuses on the primary purpose of the exclusionary rule—deterring police misconduct. See *State v. Talkington*, 301 Kan. 453, 487, 345 P.3d 258 (2015) ("'To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it.' *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 [2009]."). Thus, under *Strieff*, even if an officer conducts a proper search incident to lawful arrest after discovering a warrant, the evidence may still be suppressed if the officer engaged in flagrant police misconduct. See *Strieff*, 136 S. Ct. at 2063-64. "For the violation to be flagrant, more severe police misconduct is required than the mere absence of proper cause for the seizure." *Strieff*, 136 S. Ct. at 2064.

In *Strieff*, when considering whether the officer's conduct was flagrant, the United States Supreme Court examined whether the officer acted in good faith; determined that the officer's "decision to initiate the stop was mistaken, [but] his conduct thereafter was lawful"; and concluded "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct." 136 S. Ct. at 2063.

The first of these considerations of whether the officer acted in good faith turns on the officers' subjective state of mind. In other words, did they honestly but mistakenly

believe they had reasonable suspicion to detain Sanders and did so as part of a bona fide investigation of suspected criminal activity, not merely in the hope something would turn up? See *Strieff*, 136 S. Ct. at 2063-64. In *Brown*, 422 U.S. at 605, the United States Supreme Court expanded on facts in that case that suggested the police officers' conduct had been purposeful. The Tenth Circuit and other courts have summarized that discussion, itemizing some considerations:

> "[P]urposeful and flagrant misconduct is generally found where: '(1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed "in the hope that something might turn up."' *United States v. Simpson*, 439 F.3d 490, 496 (8th Cir. 2006) (quoting *Brown*, 422 U.S. at 605). Additionally, it may be significant that the 'officers ha[d] no right whatsoever to detain the person from whom consent is sought.'" *United States v. Fox*, 600 F.3d 1253, 1261 (10th Cir. 2010).

Consistent with these considerations this court has found flagrant misconduct where an officer knowingly detains someone without authority. See *Cleverly*, 305 Kan. at 612. And *Cleverly* adheres to the United States Supreme Court's flagrancy standard. See *Kaupp v. Texas*, 538 U.S. 626, 628, 633, 123 S. Ct. 1843, 155 L. Ed. 2d 814 (2003) (flagrant misconduct where a warrantless arrest was made in the arrestee's home after police were denied a warrant and at least some officers knew they lacked probable cause); *Taylor v. Alabama*, 457 U.S. 687, 692-94, 102 S. Ct. 2664, 73 L. Ed. 2d 314 (1982) (flagrant misconduct where arrest made without probable cause in order to interrogate suspect in hope that something might turn up); see also *Fox*, 600 F.3d at 1261-62 (flagrant misconduct where officer detained motorist without reasonable suspicion to obtain consent to search in hope something might turn up); *United States v. Shaw*, 464 F.3d 615, 630-31 (6th Cir. 2006) (flagrant misconduct where arrest made without probable cause to conduct interrogation in the hope that something might turn up).

Here, the district court found: "I still think the whole thing had been set up to be able to make the contact and do those things with [Sanders]. Then they find out about the warrant." And "those things" the district court referred to were questioning Sanders and conducting a frisk. It further found the officers pieced together their justifications after the fact. In other words, the district court found the officers did not have a subjective, good-faith belief that their actions were justified when they initiated the seizure. Instead, they acted on the hope something would turn up. Their actions were purposeful and flagrant misconduct. See *Kaupp*, 538 U.S. at 628; *Taylor*, 457 U.S. at 692-94; *Cleverly*, 305 Kan. at 612.

As to another flagrancy consideration, the United States Supreme Court found it significant that the officer in *Strieff* acted legally after he made an unconstitutional seizure. 136 S. Ct. at 2063. Here, the officers made an unlawful seizure and then conducted two warrantless searches. And the State has failed to establish a valid exception to the warrant requirement for either search. In other words, the officers committed several unconstitutional violations.

In summary, the panel erred in concluding there is "no evidence in the record to suggest that the officers' seizure—albeit overzealous—constitute[d] flagrant misconduct." See *Sanders*, 2018 WL 2375258, at *7. The third factor weighs in favor of suppression. The district court properly reached that conclusion when it mentioned the attenuation doctrine and said: "[T]hey find out that there's a warrant but my belief, counsel, is that the activity or that the whole issue of seizing the defendant, I have great difficulty with based on the testimony that I've heard." The district court also found the "issue [with] seizing the defendant" was that it was set up. Even if no other *Brown* factor weighed in favor of suppression, the officers' flagrant misconduct would tip the scale. But all three factors tip that way. The district court did not err in suppressing the evidence.

27

3. *The State failed to preserve its inevitable discovery argument.*

Finally, the State argues the Court of Appeals erred in not considering its argument that the officers' practice of inventorying personal possessions upon arrest or on booking would sustain applying the inevitable discovery doctrine. Although it is not clear why the Court of Appeals did not consider the argument, we conclude the argument fails because the State has not overcome factual and procedural problems related to its argument.

First, and perhaps most problematic for the State, it did not raise the argument in the district court. The only citation to the record we find in the State's brief is the recitation of the fact that Officer Belt stated that when he searched the deck of cards he was packaging the seized items to take them to the Department of Corrections. "I was just going through to make sure I didn't miss anything at that point." But the State does not cite a point in the record where it explicitly asked the district court to consider whether the items would have been inevitably discovered or to apply the inventory exception to the warrant required. At best, the State points to the prosecutor's statement at a motion hearing that "it wasn't until after the warrant, after he was for sure going to jail that the methamphetamine was found inside the deck of cards." What the prosecutor wanted the district court to take from the statement is unclear. Even the State relies on the same statement to support its contention that it preserved its attenuation doctrine argument before the district court. The argument does not clearly invoke the separate exception of the inevitable discovery doctrine. Nor do we find any citation of authority to support applying the State's theory. The lack of any further discussion of or argument about the inevitable discovery doctrine by the parties or the district court conveys no one understood the doctrine to be in issue.

"Generally, parties may not raise constitutional issues for the first time on appeal unless they successfully argue that one of three recognized exceptions applies." *State v.*

28

*Alvarez*, 309 Kan. 203, 209, 432 P.3d 1015 (2019). Based on this principle, Rule 6.02(a)(5) (2019 Kan. S. Ct. R. 35) requires an appellant's brief—here, the State's brief before the Court of Appeals—to include "a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." The State provided neither a record citation nor an explanation of why the Court of Appeals could consider the issue for the first time on appeal. Thus, had the Court of Appeals acknowledged the State's argument, it would have been appropriate to decline to consider the merits given the State's failure to preserve the inevitable discovery doctrine or the inventory exception. See *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015) (Rule 6.02[a][5] is to be strictly enforced). Litigants who ignore this rule risk a ruling that the issue has been waived or abandoned. *State v. Williams*, 298 Kan. 1075, 1085, 319 P.3d 528 (2014).

Simply put, the State has not preserved its arguments about either the inevitable discovery doctrine or an inventory search exception. We thus uphold the district court's suppression of the evidence.

CONCLUSION

The State failed to establish a legal basis for the officers' various actions throughout their encounter with Sanders. The officers lacked reasonable suspicion to detain Sanders or to search him. When they later discovered an arrest warrant, they had the duty to execute that warrant. But doing so did not attenuate the taint of the unlawful seizure, especially because of the officers' flagrant action. Thus, the district court appropriately suppressed the evidence based on the arguments presented to it. The State failed to preserve any other arguments it seeks to raise on appeal.

The judgment of the Court of Appeals reversing the district court is reversed. The judgment of the district court is affirmed.